# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
August 17, 2011 Session

## STATE OF TENNESSEE v. JEREMY BRANDON SCOTT

**Appeal from the Criminal Court for Davidson County**
**No. 2009-B-2017     Monte Watkins, Judge**

---

**No. M2010-01632-CCA-R3-CD  - Filed October 24, 2011**

---

The Defendant, Jeremy Brandon Scott, pled guilty to aggravated assault, a Class C felony. See T.C.A. § 39-13-102 (2006) (amended 2009, 2010, 2011).  Although he was sentenced as a Range I, standard offender to three years and six months with six months' confinement, a conflict exists regarding the length of probation.  On appeal, the Defendant contends that the trial court erred by denying his request for judicial diversion and his request for three years' probation.  We affirm the denial of judicial diversion and the imposition of six months' confinement.  We vacate the judgment of the trial court and remand the case to the Davidson County Criminal Court for clarification of the length of probation and entry of a corrected judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Vacated;
Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JERRY L. SMITH, J., and DONALD P. HARRIS, SR. J., joined.

Glenn Funk, Nashville, Tennessee, for the appellant, Jeremy Brandon Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

According to the State's recitation of the facts at the guilty plea hearing:

> [O]n August 10, 2008, at approximately 56 minutes after midnight, patrol officers responded to a call at Silverado's Night Club at 1204 Murfreesboro Road . . . in Davidson County.

When [the police] arrived at the location, they were told that the victim, Michael Stack, was struck numerous times in the head and in the face causing unconsciousness. The victim was transported to Vanderbilt Hospital for treatment for trauma to the head. Witnesses that were there spoke with the police . . . . Christopher M. Banks [stated] that he knew the suspect [and] had seen him before. [Mr. Banks] was standing behind the victim when the Defendant walked up and hit the victim in the back of the head. The victim immediately fell back unconscious, and then the Defendant . . . got on top of the victim and punched him about six times while he was unconscious on the floor. It was Mr. Banks that pulled [the Defendant] off the victim and [Mr. Banks] identified the Defendant from a photographic line up.

[Mr. Banks's girlfriend at the time], Ashley Blevins, . . . was also present and . . . told the police that the Defendant had hit the victim five or six times in the back of the head.

Richard Easman would testify that he was actually behind the bar when he saw the Defendant punch the victim in the back of the head. He would testify that the victim's eyes rolled back in his head, he fell straight back and was unconscious on the floor. He would then testify that the suspect got on top of the victim while he was on the floor, unconscious and hit him numerous times.

. . .

[The victim's treating physician at Vanderbilt Hospital,] Dr. Oren Arenson . . . would also testify that had the victim not received treatment for an additional thirty minutes . . . he would not have survived. . . . The victim had forty nine staples to the back of the head. He had cranial bleeding and . . . [was] at the hospital for an additional seventeen days after this event. He also sustained numerous learning problems.

. . .

Detective Greg Jennings did interview the Defendant, and the Defendant told [the] Detective . . . that he walked to the bar to get a drink for himself and some friends. He said that he reached between the victim and someone else to motion for the bartender and that the victim pushed his arm away. [A]ccording to the Defendant, he asked the victim what the problem was. The victim turned around and that he thought that he was going to assault him. So he admitted to the police that he punched the victim, and he also admitted that he hit the victim numerous times while the victim was on the ground.

The record shows that the trial court asked the Defendant if the facts presented by the State were true and that he answered, "Yes, sir." The Defendant pled guilty to aggravated assault on the understanding that his sentence, as well as the manner of service or if he would receive judicial diversion, would be determined by the trial court at the sentencing hearing.

On July 18, 2010, a sentencing hearing was held. The presentence report was received as an exhibit and Bryan Stack, the victim, read a self-prepared victim impact statement:

It's a strange moment, the moment doctors, nurses and social workers, who up until that moment had no business in my life, [my] parents . . . were standing beside each other and looking at me as I lay in bed. As I attempted to release the side rail that inhibited me from getting out of bed, they both rushed over in unison and helped . . . me off the bed and led me to the bathroom. At that moment, I was certain that this was going to be more than an unstoppable dream, that if I did stay in a dream, that I would simply wake up from and rebel. I quickly knew that this was not the case as goose bumps shot up my spine when my bare feet hit the cold spot on the baby blue tiles in the bathroom. I coursed my hands over what seemed like an endless chain of staples wrapping around the lefthand side of my skull. I tilted my head as I leaned in for a closer inspection and felt a tug from a tube that was around the back of my head firmly taped to my shoulder to allow for easy drainage and excess blood. The anxiety and uncertainty and fear that grew every second as I looked into the mirror confirmed that this [was] no dream and the devastated image that confronted me was, in fact, accurate. After assessing my head for twenty or so minutes, I went back to bed and asked my parents why I was here and what

happened. They informed me that I had been the victim of a violent crime and that I was in a rehabilitation hospital, that I needed to get some rest.

I went to bed not knowing what happened and what tomorrow and the following days would have in store for me. I would have to adhere to a rigorous daily schedule for the following seventeen days. I found myself part of a team . . . the team at Vanderbilt's Stallworth Rehabilitation Hospital. Breakfast at 6:45 a.m., speech therapy at 8:00, upper extremity therapy at 9:30 a.m., physical therapy again at 11:00 a.m., lunch at 11:30, occupational therapy at 12:30, physical therapy again at 3:15, and dinner at 4:45 in the cafeteria. I learned quickly that enormous odds existed and that only an unflinching determination would determine my hope for restoring my previous life which was so nearly lost.

On the fifteenth day, the staples were removed from my head. Shortly thereafter, Dr. Oran Aaronson walked in and introduced himself as the man who performed the craniotomy in order to stop the hemorrhage that I had suffered. As I performed the battery of tasks during the neurological examination, I took a moment and asked him how serious was my injury when I arrived at the emergency room. He bluntly stated, your injuries are textbook example of what I would expect to see from a baseball bat slamming against someone's head. You were twenty, thirty minutes away from certain death. It was, in fact, a massive hemorrhage. We were able to quickly access the situation and perform surgery immediately to relieve the blood that was slowly crushing your brain.

For the first time in my life, I found myself lacking emotion. This is the most devastating thing that anybody had ever told me. I could not cry. It was as if I had lost the ability to do so altogether.

Two days later, I was discharged from the hospital and classes were starting back at school. My fall schedule had been deleted because I was unable to confirm my schedule . . . . The summer class final exam that was scheduled the following Monday after

the assault, I never got to sit and take and thus I never received credit for the class. I'll wait until September to be cleared by a neurosurgeon to drive a car again and attend school. I had to wait until the following spring to attend classes. This gave me time to visit doctors and schedule follow-up surgeries.

The Dentist will have to file several chipped teeth and affix one ceramic crown. Plastic surgeons would have to perform a rhinoplasty to restore breathing through my nose and an autoplasty to repair a tear on my right ear.

After the surgeries, I returned to school, lacking the ambition that coursed through my veins the previous summer. I found out quickly that I could not handle the course load I had previously taken and found myself having to devote every moment to study the material by reading every chapter three to four times, whereas, before, I could understand the material after reading it just once. I reluctantly admitted to myself, friends and family that there was a problem. For the first time, I realized why the rehabilitation doctors told me that I was . . . in denial.

I do not look injured because my brain . . . damage was not visible to the naked eye. Problems of memory, planning and organization were still - were and still to this day I feel in subtle ways. I was forced to register at Disabled Student Services due to these deficits. . . . I should have graduated in December of 2009. I had planned to sit and pass all four parts of the CPA exam by the following spring and begin graduate school in the fall. . . . Despite the amounts of anger that Jeremy Scott has created in me, I will graduate from MTSU fall [2010] by studying the most challenging of business majors with a Bachelor of Business Administration degree in accounting. The ordeal that Jeremy Scott inflicted upon me in 2008 can never be purged and never forgiven.

I had never seen Jeremy Scott until November 6, 2008, when I arrived . . . in General Sessions Court. The smirk on his face showed no remorse and demonstrated that he was absolutely content that he nearly killed me. To this day, I do not know why I was targeted and why this happened to me. I've stayed up

countless nights trying to figure out why all this happened. I remember walking to my car and I realized I never closed my tab. I walked back in, stood at the bar, waited for the bartender. And I awoke at the hospital. Acting upon reliable information and evidence, investigators explained to me that I was struck in the back of the head and slid to the floor and proceeded to have my head beat in before a bystander pulled Mr. Scott off me. Guilt-ridden by the shame of this crime, he fled the scene. His crime lacked chivalry, reasoning. It was a very cowardly act.

As I approach my twenty-seventh birthday this month, I have to come to the conclusion that justice in life can be forever elusive. I think sometimes I may never quite find it, but since August 10, 2008, my search for it has been compulsive. It's been postponed, its been rescheduled, but today it has to be faced, right here on the spot. The search for it is clearly what drives this endeavor taking place before us.

I now appeal to you to sentence Jeremy Scott to the maximum prison time allowed by law and that there be no chance of probation or conditions allowing his cunning and cruel criminal act to be purged from the record. You are looking and listening to someone who has survived Jeremy Scott's callous disregard for human life. I'm hopeful that you'll protect society from him.

The victim testified that he had just turned twenty-five on the night of the assault. He was handed three photographs and identified each as photographs taken at Stallworth Rehabilitation Center. The trial court received the photographs as an exhibit after defense counsel noted the photographs were taken post-operation. The victim identified a fourth photograph showing the four titanium plates inserted on the left side of his skull. He said the four permanent titanium plates kept his skull intact and were secured with sixteen titanium screws. The picture of the victim's skull was received as an exhibit.

The victim testified that he remained in the hospital for seventeen days. He said he received additional time for exams at Middle Tennessee State University. He stated that he registered for fifteen hours of course work for the spring semester following the assault but realized that fifteen hours was too much. He said that before he was attacked, he was able to complete eighteen hours of course work each semester. He said that after the assault, he became more alert of his surroundings and always looked to see who was around him. He

said he became cynical, lost his ability to show emotion, and could not cry due to the brain damage.

On cross-examination, the victim testified that the assault occurred at a bar called Silverados and that he had been there for over an hour before the assault. He did not remember the fight, but remembered he consumed six to eight alcoholic drinks over the course of the day. He did not know his blood alcohol content when he arrived at the hospital. He said he had never seen the Defendant before the night of the assault.

On redirect examination, the victim testified that on August 10, 2008, he and a roommate played a round of golf that morning, went back to his roommate's house, watched television, went to Cancun restaurant, and went to the Titans' preseason game. He said that after the game, they went to Big River downtown and that after they left, he received a telephone call from friends asking him to come to Silverados. He said he did not drink at the golf course that morning and had one sixteen ounce beer at the football game. He said he drank two beers at Big River and drank one beer and two mixed drinks at Silverados. On recross-examination, Mr. Stack testified that he was about 6'2" tall and weighed about 164 pounds in 2008.

James H. Stack, the victim's father, testified that on the morning of August 10, 2008, he received a voicemail message from someone at Vanderbilt hospital stating that his son was "seriously" injured and that he needed to get to the hospital as soon as possible. He said that after he heard the message, he panicked and that he and his oldest son went to the hospital. He said that when he was able to visit his son in the trauma center, he noticed the beds were numbered. He said his son was in bed number one, which meant his son had the most severe head trauma in the center. He stated that he was not an emotional man but that when he saw his son, the bandages on his son's head, his purple son's eyes and swollen lips, he "broke down" because he thought his son was going to die. He said visitation was restricted in the trauma center and he was not able to sit with his son as much as he wanted. He said that although the hospital staff told him that his son was young, strong, and his vital signs were improving, he still felt his son was not going to survive.

Mr. Stack testified that after his son was moved to a private room, he met Dr. Oran Aaronson. Dr. Aaronson told him that his son had a serious injury and that if his son had been delayed by thirty minutes in getting to the hospital, he probably would not have survived. Mr. Stack said that on the third day, his son's bandages were removed and he saw fifty-four staples and a drainage tube in his son's head. He said that he, the doctor, and a nurse had to remove the drainage tube together due to the intensity of his son's pain. He said he had to hold his body on top of his son's body to keep him from fighting due to the pain. He said his son was moved to Stallworth Rehabilitation Center on the fourth day and

stayed there for fourteen days. He was released from the rehabilitation center on the conditions that he not drive and that someone stay with him around the clock.

Mr. Stack testified that after his son was cleared by the doctors to drive, he could tell things were not the same because his son's organizational skills were different. His son had to relearn simple tasks such as buttoning a shirt and brushing his teeth. He stated that the type of brain trauma his son suffered required a long time to heal. He said his son could not play golf or team sports because the possibility of being struck in the head was too high. He was present when Dr. Aaronson told his son the extent of his injuries and compared the injuries to being hit in the head with a baseball bat. He said the doctor indicated that there was permanent brain damage. Mr. Stack stated that he thought the Defendant should receive the maximum sentence allowed by law. The victim's medical records were received as an exhibit.

The Defendant testified that he was charged with driving on a revoked license and reckless driving before the assault. He said that the driving on a revoked license charge was dismissed and that he received a ninety-day suspended sentence for reckless driving. He said he had not been charged with any additional criminal offenses other than the aggravated assault at issue.

The Defendant testified that he owned his own plumbing business that employed one additional person. The Defendant learned his craft from his grandfather and worked for him before he started his own business. He said he graduated from White House High School but did not go to college.

The Defendant testified that he arrived at Silverados at midnight on August 10, 2008, with his girlfriend and her cousin. He said he was not upset about anything, had not been in any fights, and nothing bad happened that day. He stated after he arrived at Silverados, he walked to the bar to order drinks from the bartender, stood beside the victim at the bar, and motioned for the bartender. He said the victim grabbed his arm and "slung" him away from the bar. The Defendant asked the victim why he grabbed him, and the victim responded that the Defendant should not put his arm on the bar anymore. The Defendant said he did not understand, tried to ignore the victim, and continued to motion for the bartender. The Defendant stated that the victim grabbed him a second time, pushed him away from the bar, and acted like he was going to hit him. The Defendant said that the victim's fists were clinched and that the victim asked if the Defendant "had [his] boys ready." The Defendant said that he thought the victim was going to hit him and that when the victim stepped toward him, he punched the victim in the face.

The Defendant testified that he was 5'8" tall and weighed about 150 pounds at the time of the assault. He agreed the victim was taller and weighed more than he did. The Defendant admitted that he punched the victim first and that the victim fell to the ground. The Defendant said he stepped over the victim and hit him two or three more times. The victim never struck the Defendant. He said that although he did not think it was wrong to hit the victim first, he thought it was wrong to hit the victim after the victim fell to the ground. He said that he wished he had not hit the victim while the victim was on the ground and that for that reason, he pled guilty to aggravated assault. The Defendant said that after he realized the victim was not getting up, he stepped away. He said security asked him what happened and told him to leave. He stated that security did not escort him out of the building and that he walked out the front door. He said he left because security asked him to leave.

The Defendant testified that the police contacted his girlfriend and that she told him the police wanted to talk to him. He contacted the police and gave a statement admitting he punched the victim. The Defendant said that he was scared and that he never laughed about the situation to anyone.

On cross-examination, the Defendant admitted that he waited one day before he contacted the police. He agreed he told the police that he went to the bar when he arrived at Silverados and that the victim was attempting to pay his bar tab. After he reviewed the police report, the Defendant agreed with the State that he told the police that the victim "pushed" his arm once rather than "slung" his arm twice. The Defendant said that he did not remember the exact words he used when he gave his statement but that he was not changing his version of the events. He said that he told the police the victim moved toward him but that he did not know if he told the police exactly what the victim did. He said he told the police the victim "pushed me away from the bar" and threatened to beat him up.

The Defendant agreed that the State announced at the guilty plea hearing that several witnesses would have testified at a trial that "the first punch was thrown to the back of the head." The Defendant did not recall that the State also announced that witnesses would have testified that after he hit the victim in the back of the head, the victim's eyes rolled back in his head and that the victim fell to the ground. The Defendant said he was wrong to have hit the victim after the victim fell to the ground. He recalled that there were several witnesses who would have testified that after he hit the victim, the victim became unconscious and fell to the ground. The Defendant agreed that it was physically impossible to hit someone who was on the ground without bending over at his 5'8" height. He agreed the State announced during the guilty plea hearing that there were witnesses who would have testified that he punched the victim five or six times on the ground, that the victim did not regain consciousness, and that a witness pulled him off the victim. When asked if the entire

incident was due to the victim's pushing his arm, the Defendant said it was because the victim pushed his arm and made threatening statements.

On redirect examination, the Defendant testified that he was not aware of any witnesses who would have testified that they were certain the victim was unconscious at the time he fell to the floor. He said he was not aware that the victim was unconscious after he threw the first punch.

Roger House testified that he had known the Defendant for five years. He said he met the Defendant when the Defendant worked on a plumbing problem at his home. He said the Defendant joined his race car team. Mr. House stated that he never had any problems with the Defendant and that the Defendant was helpful, did whatever was needed, and worked on cars during the week at his home and at local race tracks. He said he never saw the Defendant be violent, get angry, or fight. He thought the Defendant had good character and did not think the Defendant deserved the maximum sentence. He also did not believe the Defendant deserved to go to jail. On cross-examination, Mr. House defined a fight as an event where two people hit each other and agreed that a fight is not an event where only one person hits another.

George Bartlett, a forty-three year employee for the City of Belle Meade, testified that he had known the Defendant since the Defendant was a young child. He said he met the Defendant through the Defendant's grandfather, who also worked for the City of Belle Meade. He said that as a young boy, the Defendant came to work with his grandfather. He said he knew the Defendant well and never saw the Defendant be violent, attack anyone, "go off on someone for no reason," or yell at anyone. He never knew the Defendant to get into trouble and did not think the Defendant would get into trouble again. Mr. Bartlett did not think the Defendant deserved a sentence that included jail time.

On cross-examination, Mr. Bartlett testified that he had four children and that all four were legally allowed to drink alcohol and that they had gone to bars. When asked if one of his children had been attacked like the victim in this case, Mr. Bartlett said that his children should not be at a bar drinking with someone who is out of control. He stated common sense should tell a person how far to go.

Kenneth Midgett, a lawn and landscape business owner, testified that he met the Defendant when the Defendant was ten years old. The Defendant played youth football for him. He said the Defendant had good character and was not a "menace to society." He said that the Defendant was not violent on the football field and that he tried to get the Defendant to be more aggressive as a football player. He never saw the Defendant be violent off the football field. He did not think the Defendant deserved a sentence that involved jail time.

On cross-examination, Mr. Midgett testified that he never went to a bar or drank with the Defendant. He agreed he did not know how the Defendant acted when he was under the influence of alcohol.

Mark Poe, a general contractor, testified that he met the Defendant through his plumbing business and had known the Defendant for twelve years. He said he and the Defendant went to dinner a couple of times after work. He never saw the Defendant get angry or upset at work or knew the Defendant to have violent outbursts. He stated that the Defendant had great character and that the judge should not sentence him to jail.

On cross-examination, Mr. Poe testified that he had never gone to a bar with the Defendant and that he did not know how the Defendant behaved when under the influence of alcohol. He agreed he did not know what the Defendant did after work. When asked about the injuries the Defendant inflicted on the victim, he stated that when "anybody goes in a bar late at night, you walk in the door, you know what's going to happen . . . . [E]verybody in there takes a risk." He did not think the risk was acceptable but was just a part of the environment. He said he told his children that if they decided to go to a bar after midnight, there was a risk of getting into a fight. When asked if he agreed that a fight consisted of two people, Mr. Poe said he saw a couple of fights where one person threw a single punch, hit the other person, and the fight was over, but he conceded a fight was when both people attempt to hit the other. On redirect examination, Mr. Poe testified that he told his sons that it was better to defend themselves first rather than be hit first.

Alexis Saeaung testified that she had been the Defendant's girlfriend for six or seven months at the time of the incident. She said the Defendant was neither drunk, impaired, nor in a bad mood that night. She never knew the Defendant to be a violent man in general or to be violent in bars. She did not see the fight occur.

On cross-examination, Ms. Saeaung testified that the owners of Silverados knew her and knew that the Defendant was with her the night of the assault. She said the owners had her telephone number but not the Defendant's telephone number. She said the police contacted her and left a message for her to return their telephone call. She contacted the police and told them the story the Defendant told her. She said she did not see the fight and never told the police she saw the Defendant punch the victim while the victim was on the ground.

The trial court's findings of fact state the following:

> One of the major concerns that I have with respect to bars . . . is
> we now have to deal with people taking guns into bars. And

what if someone had a gun that particular night, I don't know what would have happened. The fact of the matter is that this victim almost died and the court has to strongly consider that single fact.

The Court will look to whether [there] are mitigating or enhancement factors. And with respect to any mitigating factors, the court believes that there may have been some provocation and will grant that. With respect to enhancement factors, the court looks at enhancement factor number six, that the personal injury inflicted upon the victim was particularly great. And enhancement factor number ten, that the Defendant had no hesitation about committing an offense that could have caused serious bodily injury or death.

Considering those - and, obviously, the Defendant is a Range I offender - the court believes that the enhancement factors do outweigh the mitigating factors; therefore, the length of sentence will be three and [one-]half years. The court further believes that because the victim in this case almost died, 40-35-313 is just not appropriate in this particular case. And the Court further believes that under 40-35-103, that confinement is necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others who may commit similar offenses. As such, the court believes that a sentence of six months with jail credit is appropriate, three and [one-]half years of probation, upon completion of that sentence, with the standard conditions. And that will be the judgment of the court.

# I

The Defendant first contends that the trial court erred by denying his request for judicial diversion pursuant to Tennessee Code Annotated section 40-35-313. The State contends that the trial court correctly denied judicial diversion based on the circumstances of the offense. We agree with the State.

A trial court may grant a defendant's request for judicial diversion and "defer further proceedings against a qualified defendant and place the defendant on probation upon such reasonable conditions as it may require without entering a judgment of guilty." T.C.A. § 40-

35-313(a)(1)(A). A Defendant is eligible for judicial diversion if he or she is found guilty of or pleads guilty or nolo contendere to a Class C, D, or E felony or a lesser crime, has not previously been convicted of a felony or a Class A misdemeanor, and is not seeking deferral for a sexual offense. Id. § 40-35-313(a)(1)(B)(i). The Defendant pled guilty to aggravated assault, a Class C felony, and had not been previously convicted of a Felony or Class A misdemeanor. The Defendant was eligible for judicial diversion.

Judicial diversion allows the trial court to defer further proceedings without entering a judgment of guilt and to place the defendant on probation under reasonable conditions. T.C.A. § 40-35-313(a)(1)(A). When the probationary period expires, if the defendant has completed probation successfully, the trial court will dismiss the proceedings against the defendant with no adjudication of guilt. See T.C.A. § 40-35-313(a)(2). The defendant may then apply to have all records of the proceedings expunged from the official records. See T.C.A. § 40-35-313(b). A person granted judicial diversion is not convicted of an offense because a judgment of guilt is never entered. See T.C.A. § 40-35-313(a)(1)(A).

The decision to grant judicial diversion lies within the sound discretion of the trial court, and this court will not disturb that decision on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); see State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996) (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). This court will give the trial court the benefit of its discretion if "'any substantial evidence to support the refusal' exists in the record." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 353, 356 (Tenn. 1983)). "The same guidelines are applicable in diversion cases as are applicable in probation cases, but they are more stringently applied to those seeking diversion." State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In determining whether to grant judicial diversion, the trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice. Electroplating, 990 S.W.2d at 229; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In addition, "the record must reflect that the court has weighed all of the factors in reaching its determination." Electroplating, 990 S.W.2d at 229. If the trial court refused to grant judicial diversion, it should state in the record "the specific reasons for its determinations." Parker, 932 S.W.2d at 958-59.

Although the record shows that the trial court found some provocation, the court also found that the injury inflicted upon the victim was great and that the Defendant had no

hesitation about committing an offense that could have caused serious bodily injury or death. The court also found that confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others who may commit similar offenses. Based on these factors, the trial court believed six months' incarceration was appropriate. The trial court stated that because the victim almost died, judicial diversion was not appropriate. Although the record shows there is evidence to support the trial court's decision, the trial court failed to address each of the considerations detailed in Electroplating. The trial court focused on the circumstances of the offense and the deterrence value, but no mention is made in the findings of fact of the Defendant's amenability to correction, the Defendant's social history, the Defendant's physical and mental health, or whether judicial diversion would serve the ends of justice. However, "[t]he same guidelines are applicable in diversion cases as are applicable in probation cases, but they are more stringently applied to those seeking diversion." Bingham, 910 S.W.2d at 456. As we believe there was a sound basis for the denial of full probation, which is discussed below, we conclude the trial court's procedural failures constitute harmless error. See State v. Arhonda Rice, W2000-03004-CCA-R3-CD, Shelby County (Tenn. Crim. App. Oct. 16, 2001); see Bingham, 910 S.W.2d at 456 (a defendant who was not suitable for full probation was also not entitled to judicial diversion); see also State v. Keaton M. Guy, E2007-01827-CCA-R3-CD, Anderson County (Tenn. Crim. App. Dec. 8, 2008) (holding trial court did not abuse its discretion in denying judicial diversion because there was a sound basis for the denial of full probation).

## II

The Defendant also contends that the trial court committed error by denying his request for three years' probation. The State contends that the trial court imposed a sentence in accordance with the appropriate statutes. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The guidelines applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion. Bingham, 910 S.W.2d at 456. The trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6)

-14-

the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

Pursuant to the Criminal Sentencing Reform Act's 2005 revisions, a defendant is eligible for probation if the sentence imposed is ten years or less but is no longer entitled to a presumption that he or she is a favorable candidate for probation. See T.C.A. § 40-35-303(a) (2006); Carter, 254 S.W.3d at 347. A defendant has "the burden of establishing suitability for probation." Id.; see T.C.A. § 40-35-303(b). In order for a defendant to meet this burden, he or she must show that "probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" Carter, 254 S.W.3d at 347 (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). A defendant's sentence "is based on 'the nature of the offense and the totality of the circumstances in which it was committed, including the defendant's background.'" State. v Trotter, 201 S.W.3d 651, 653 (Tenn. 2006) (quoting Ashby, 823 S.W.2d at 168 (citations omitted)). Under the Criminal Sentencing Reform Act of 1989, trial courts are given guidelines to aid their sentencing decisions. The Act's relevant portions related to alternative sentencing include the following:

> (5) In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons

-15-

committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing a failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration;

(6)(A) A defendant who does not fall within the parameters of subdivision (5), and who is an especially mitigated or standard offender convicted of a Class C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary; and

. . .

(6)(D) A court shall consider, but is not bound by, this advisory sentencing guideline.

T.C.A. § 40-35-102(5)-(6) (2010). When determining if incarceration is appropriate, a trial court should consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(2010); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000). This court has held when a trial court denies alternative sentencing and imposes incarceration on the basis of the seriousness of the offense, "'circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." Grissom, 956 S.W.2d at 520 (citing State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995) (quoting State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991))); see State v. Trotter, 201 S.W.3d 651 (Tenn. 2006).

In determining that six months' confinement was appropriate, the record shows that the trial court "strongly considered" that the victim almost died from the injuries the Defendant inflicted. Although the court found that there may have been some provocation, it also found that the personal injury inflicted upon the victim was particularly great and that the Defendant had no hesitation about committing an offense that could have caused serious bodily injury or death. The trial court found that these enhancement factors outweighed the possible provocation. Based on these findings, the trial court determined that confinement was necessary under Tennessee Code Annotated section 40-35-103 to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others who may commit similar offenses.

We note that the Defendant does not have a long history of criminal conduct, having only a conviction for reckless driving for which he received a ninety-day suspended sentence. See T.C.A. § 40-35-103(1)(A) (2010). We also note that because the Defendant does not have a lengthy criminal history, less restrictive measures than confinement have not been applied unsuccessfully to the Defendant. See T.C.A. § 40-35-103(1)(C). Although the record shows that there is evidence to support the trial court's decision to deny full probation, the trial court failed to address each of the considerations detailed in Goode and Electroplating. The trial court focused on the circumstances of the offense and the deterrence value, but made no mention in the findings of fact of the Defendant's amenability to correction, the Defendant's social history, the Defendant's physical and mental health, or whether probation would serve the interests of justice. The record shows, however, that the nature of the Defendant's offense outweighs factors in favor of full probation and supports the trial court's finding that six months' confinement was appropriate.

The Defendant punched the victim in the back of the head, and the victim fell to the floor unconscious. The Defendant continued to strike the victim in the head while the victim was on the floor. The victim's injuries required placing multiple titanium plates and screws in his skull and approximately fifty staples in his head. His doctors believed the victim would have died had he been delayed in getting to the hospital. The victim suffered brain injuries and had to relearn basic skills such as buttoning a shirt and brushing his teeth. He suffered loss to his emotional capabilities and experienced a change in his organization skills. The victim was also delayed in obtaining his college degree. Although the Defendant presented numerous character witnesses to the trial court, we believe the trial court did not err in finding that the circumstances of the offense were "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree," and outweighed all factors favoring full probation. See Grissom, 956 S.W.2d at 520 (citations omitted); State v. Davis, 940 S.W.2d 558, 559-561 (Tenn. 1997) (upholding the denial of probation for vandalism committed in retaliation for crossing a picket line and resulting in only $1200 of damages). As in the trial court's decision to deny judicial diversion, we

believe there was a sound basis for the denial of full probation and conclude the trial court's procedural failures constitute harmless error. The Defendant has not met his burden and is not entitled to relief.

We must note, though, that a conflict exists regarding the length of probation. The judgment first reflects a sentence of three years, six months. In the Alternative Sentence section, the judgment reflects probation for three years, six months "after serving 6 months." The Special Conditions section of the judgment provides for "six months to serve and then the remaining time on probation." The transcript reflects that the trial court stated the length of sentence was three years, six months, but added, "As such, the Court believes that a sentence of six months with jail credit is appropriate, three and [one-]half years of probation, upon completion of that sentence, with the conditions." The sentence is three years, six months. The question, though, is whether the Defendant is required to serve six months followed by probation for three years or for three years, six months. The case needs to be remanded for clarification and entry of a corrected judgment.

In consideration of the foregoing and the record as a whole, the denial of judicial diversion and confinement for six months are affirmed but the judgment of the trial court is vacated and the case is remanded to the Davidson County Criminal Court for clarification of the length of probation and entry of a corrected judgment.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE